## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARIAN GEIST                                        :
                                                    :
    v.                                              :          Civil Action No. CCB-08-183
                                                    :
GILL/KARDASH PARTNERSHIP, LLC                       :
D/B/A ARUNDEL GOLF PARK, et al.                     :
                        …o0o…

## MEMORANDUM

Now pending before the court is a motion for summary judgment filed by defendants

Gill/Kardash Partnership LLC, d/b/a/ Arundel Golf Park (hereinafter "AGP") and James

Kardash.   The plaintiff, Marian Geist, alleges gender discrimination, retaliation, and hostile

work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§

2000e et seq., against defendant AGP.  She also alleges that both defendants violated the Equal

Pay Act ("EPA"), 29 U.S.C. § 206(d), because her pay and benefits were affected by her gender,

and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.,

because they failed to provide her with documentation of health benefits.[1]  The issues have been

fully briefed and the court heard oral argument on October 7, 2009.  For the following reasons,

defendants' motion will be granted as to all claims other than retaliation.

## BACKGROUND

Ms. Geist is a Ladies Professional Golf Association ("LPGA") Teaching and Club

Professional Class A Member who was first employed by defendant AGP on January 15, 2006.

She resigned from her position at AGP in August 2007, but worked there until September 15,

2007.  AGP is a small business run by Gill/Kardash, a limited liability company organized under

the laws of the State of Maryland, which has its principal place of business in Glen Burnie,

---

[1] Ms. Geist's complaint also alleged violation of 42 U.S.C. § 1981 and breach of contract under
state law.  She subsequently withdrew these claims.  (See Pl.'s Opp'n Mem. at 2 n.5.)

Maryland.  AGP operates a driving range, mini golf course, and batting cages, and sells golf related merchandise.  It employs four full-time employees and two independent contractors, as well as several part-time employees who tend to work seasonally.[2]  Defendant and AGP partner, James Kardash, is primarily responsible for managing and operating AGP.

AGP hired Ms. Geist to be its only female golf instructor.  The parties did not enter into a written employment contract, and some of the terms of Ms. Geist's employment are in dispute. The parties agree that she was hired to work a flexible schedule of fifteen hours of "facility time" per week, which consisted mainly of marketing and promotion for the company, but also some "counter duty" in the AGP store, at an annual salary of $15,000.  Ms. Geist was entitled to perform some of her marketing duties from home.  She suggested the fifteen-hour per week schedule as an alternative to being a fully scheduled forty-hour per week employee with two set days off or an independent contractor.  (Geist. Dep. at 66: 15-7, Nov. 18, 2008.)  The parties also agree that she was entitled initially to earn seventy percent commission for teaching individual golf lessons, sixty-five percent commission for group instruction, and an additional three percent commission for the sale or fitting of equipment, which increased to ten percent during the course of her employment at AGP.  They significantly disagree, however, as to whether Mr. Kardash promised Ms. Geist that she would receive health benefits once she had been employed by AGP for three months, and whether Ms. Geist was a full-time or part-time employee.

According to Ms. Geist, the primary reason she accepted an employee rather than independent contractor position at AGP was the promise of health benefits.  (*Id*. at 177: 4-7.) Although the number of hours required for benefits was not specifically discussed at her job interview, Ms. Geist assumed it was forty hours per week.  (*Id.* at 176: 18-21.)  Ms. Geist often

---

[2] Defendants do not dispute that AGP employs fifteen or more employees or that Title VII applies to the present matter.  *See* 42 U.S.C. § 2000e(b).

worked a total of forty hours per week – between her fifteen salaried hours and teaching golf lessons – but she did not receive health benefits after ninety days of employment at AGP.

After repeated informal requests for health insurance, Ms. Geist formally asked Mr. Kardash about benefits during a July 2006 performance review.  He told her that in order to receive health benefits through AGP an employee was required to work forty hours per week.  (*Id*. at 180: 13.)  Frustrated with her situation, Ms. Geist proposed being reclassified as an independent contractor so that she could keep her personal insurance or, in the alternative, that she pay one hundred percent of the premium herself.  Mr. Kardash told her that neither option was possible.  (Geist Aff. at ¶ 11.)  After she continued to inquire about benefits – even by calling Mr. Kardash's wife at home – Ms. Geist set up a meeting with Mr. Kardash for November 16, 2006 to discuss the matter further.  At the meeting, Mr. Kardash provided Ms. Geist with a handwritten explanation of benefit eligibility which stated that an employee must be scheduled for forty hours of facility time with two set days off in order to receive benefits.  (*See id*. at ¶ 17; Handwritten Employment Options, attached to Defs.' Summ. J. Mem. as Ex. 10.)  After the meeting, in a letter to Mr. Kardash dated November 16, 2006, Ms. Geist acknowledged her option to work forty scheduled hours, but decided to remain flexible: "While I am a little disappointed that my receiving full-time benefits depends upon forfeiting my flexibility and working on Sunday mornings, I understand and respect your desire for consistency."  (Nov. 16, 2006 Letter, attached to Defs.' Summ. J. Mem. as Ex. 10.)

In the end, Ms. Geist never received health benefits from AGP and alleges this was because of her gender.  By contrast, AGP asserts it was because she was not a full-time employee with a fixed forty-hour per week schedule and therefore was never entitled to them.  In response, Ms. Geist argues that AGP's CareFirst BlueChoice health plan specifically states that

3

employees who "[w]ork on a full-time basis and have a normal workweek of 30 or more hours" are eligible (Copy of Health Insurance Plan, attached to Pl.'s Opp'n Mem. as Ex. 21), and that as the only female employee at AGP, she was the only one not receiving health benefits.[3]

Health benefits were not the only source of contention between the parties during the course of Ms. Geist's employment at AGP. Ms. Geist also contends that she did not receive the same salary, vacation and educational benefits that John Miller, the other PGA Class A professional employed at AGP, did. Mr. Miller is a forty-hour per week scheduled employee who receives a $25,000 salary and an additional seventy-five percent commission for teaching golf lessons. Ms. Geist alleges that Mr. Miller was permitted to teach golf lessons *during* his forty scheduled hours, whereas she was permitted only to schedule lessons at times *separate* from her fifteen salaried hours.[4] In this way, Mr. Miller could earn a salary and a commission during a lesson, whereas Ms. Geist could earn only a commission. Defendants dispute that Mr. Miller or Ron Jefferson[5] regularly scheduled lessons during their salaried forty hours except under rare circumstances. (*See* Greek Dep. at 60-65, Dec. 5, 2008; Jefferson Dep. at 54, Feb. 20, 2009.) Further, Ms. Geist's hourly salary was higher than Mr. Miller's – she earned approximately $19.23 per hour, whereas Mr. Miller earns approximately $12.02 per hour.

---

[3] Ms. Geist was not, however, the only individual working at AGP without health benefits. Two male teaching professionals, Parker Parson and John McGinty, also had flexible teaching schedules, but no set "facility time." They are classified as independent contractors and did not receive health care benefits. (*See* AGP Employment Descriptions, attached to Pl.'s Opp'n Mem. as Ex. 9.) In July 2006, Ms. Geist asked Mr. Kardash why Mr. Parson and Mr. McGinty could be classified as independent contractors if she could not, and Mr. Kardash allegedly responded that they should be reclassified. (Geist Aff. at ¶ 11.)

[4] Ms. Geist also alleges that Mr. Miller took unearned vacation time and attended educational Ping and Titleist club fitting sessions to which she was not invited.

[5] Ms. Geist does not, however, compare her salary to Mr. Jefferson's.

There were other ways in which Ms. Geist felt that she was treated differently because of her gender.  For instance, she asserts that all male employees received Christmas bonuses in December 2006, but she was denied one.  There is no evidence, however, that Mr. Parson and Mr. McGinty – the independent contractors at AGP – received Christmas bonuses.  Additionally, Ms. Geist was not invited to a Christmas golf outing on December 15, 2006 even though all other male employees (excluding seasonal ones) – including Mr. Parson and Mr. McGinty – attended.  (*See* Golf Outing Roster, attached to Pl.'s Opp'n Mem. as Ex. 23.)  AGP argues that the golf outing was merely an informal gathering of employees and students, and the people invited changed each year.  According to AGP, not every employee or student was involved, and Ms. Geist was scheduled to work in the golf shop that day.  (Kardash Dep. at 184-86, Oct. 15, 2008.)

Further damaging the relationship between Ms. Geist and AGP were various inappropriate and misogynistic comments made by male employees to Ms. Geist directly or in her presence.  These comments form the basis for Ms. Geist's hostile work environment claim.  Josh Greek and Mr. Jefferson, both full-time employees at AGP, were responsible for the majority of such comments, but Mr. Kardash allegedly made unwelcome remarks as well.  For instance, Ms. Geist alleges that Mr. Kardash asked her at least three times during a meeting whether she had a boyfriend, and on another occasion inquired whether she would marry him when he got divorced.  (Geist Aff. at ¶ 20.)  In addition, while watching Michelle Wie play golf on television, Mr. Kardash apparently invited Ms. Geist to travel alone with him to go watch her play at a course several hours away.  (*Id*. at ¶ 21; Geist Dep. at 202: 12-21.)  He laughed and smiled and then went back into his office.  (Geist Dep. at 202: 20-21.)  Mr. Kardash denies making any of these statements.  (Kardash Dep. at 236-37.)  Ms. Geist also alleges that Mr.

Kardash was present during a staff meeting in which Mr. Greek shouted at her, "Which one of you goddamn women complained about [the cigar smoke]?" and Mr. Kardash merely laughed. (Geist Aff. at ¶ 25.)  But Mr. Kardash recalls neither this event nor laughing at Mr. Greek. (Kardash Dep. at 238: 5-16.)

The other comments forming the basis of Ms. Geist's hostile work environment claim were Mr. Greek's and Mr. Jefferson's.  Mr. Jefferson lost his temper at Ms. Geist on at least one occasion, but is not accused of making any misogynistic comments.  Ms. Geist informed Mr. Kardash about Mr. Jefferson's outburst and Mr. Kardash scheduled a meeting with the two of them during which he reprimanded Mr. Jefferson and Mr. Jefferson apologized.  (Geist Aff. at ¶¶ 29-30.)  Mr. Greek, however, made profane and derogatory comments about women in Ms. Geist's presence with some regularity.  The most severe of the alleged behavior, which occurred in January and February 2007, includes: (1) shouting that female sports commentators should "Shut up!  Get naked or shut up!" (*Id.* at ¶ 34.); (2) gesticulating male masturbation (*Id.* at ¶ 35.); (3) saying in reference to a DVD that, "[i]f you are going to spend $15, get a movie with boobs in it.  Don't waste it on Mark Wahlberg!  . . . God made boobs and I cherish boobs." (*Id.* at ¶ 36.); (4) yelling to another male employee to "Suck my dick!"  (*Id.* at ¶ 38.); (5) screaming the word "Fuck" repeatedly (*Id.* at ¶ 39.); and (6) referring to a female customer as an "ugly, Glen Burnie bitch".  (*Id.* at ¶ 40.)

Ms. Geist complained about the "unprofessional" environment at AGP in at least two emails to Mr. Kardash, but neither email specifically mentioned any inappropriate or misogynistic comments.  (*See* March 27, 2006 and June 17, 2006 Emails from Ms. Geist to Mr. Kardash, attached to Defs.' Summ. J. Mem. as Ex. 14.)  Furthermore, Ms. Geist testified that she did not report any of Mr. Greek's aforementioned comments to Mr. Kardash.  (*See* Geist Dep. at

240-257.)  Mr. Kardash seems to have addressed the issue of office professionalism in at least some capacity because on April 3, 2006, Ms. Geist wrote to him in an email that, "[w]hatever you said to Josh worked . . . things have been much more professional and focused on work!" (Defs.' Summ. J. Mem. Ex. 14.)

At a meeting on December 22, 2006, Ms. Geist told Mr. Kardash that she intended to file a charge of discrimination with the EEOC.  Ms. Geist states that she contacted the EEOC on December 27, 2006, (Geist Aff. at ¶ 43), although it appears that she did not file a formal complaint with the EEOC until March 16, 2007.  (*See* EEOC Complaint, attached to Defs.' Summ. J. Mem. as Ex. 13.)  On December 29, 2006, Ms. Geist's first workday after announcing her intention to file an EEOC complaint, Mr. Kardash told her that her job was being restructured.  Specifically, he eliminated her salary and all marketing and counter responsibilities so that her only duties would be to teach lessons for commission.  Ms. Geist was the only employee to lose her salary.

After filing a complaint with the EEOC, Ms. Geist received a Notice of Right to Sue ("NRTS") from the EEOC on approximately November 5, 2007.  She subsequently filed the present action.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

A.    *Title VII Claims*

Ms. Geist makes three Title VII claims: (1) gender discrimination, (2) retaliation, and (3) hostile work environment. Where there is no direct evidence of gender discrimination or retaliation, such claims are analyzed under the three-pronged burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, to defeat a defendant's motion for summary judgment a plaintiff must first make out a *prima facie* case of discrimination. If the plaintiff succeeds in carrying out this initial burden, then "the burden shifts to the employer . . . 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007)

(quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en

banc)).  Once such a reason is provided, the burden shifts back to the plaintiff to demonstrate that

the given reason was a pretext for unlawful discrimination.  *Id.*

      1.     *Gender Discrimination*

Ms. Geist alleges that as an AGP employee she was discriminated against because of her

gender.  Specifically, she alleges that she was: (1) paid less than her male counterparts; (2) not

given a Christmas bonus though male employees were; (3) excluded from a Christmas golf

outing; (4) denied unearned paid vacation days even though male employees received them; (5)

deprived of the educational opportunities made available to male employees; and (6) denied

health insurance.

Under the first step of the *McDonnell Douglas* framework, a plaintiff must establish a

*prima facie* case of discrimination.  To do so with respect to benefits or compensation, a plaintiff

must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse

employment action with respect to compensation; and (4) that similarly-situated employees

outside the protected class received more favorable treatment."  *White v. BFI Waste Servs., Inc.*,

375 F.3d 288, 295 (4th Cir. 2004).  It is undisputed that Ms. Geist is a member of a protected

class under Title VII.  It is also undisputed that at the time of the alleged adverse employment

actions Ms. Geist was performing at a level that met AGP's expectations.  Assuming without

deciding that Ms. Geist has met her burden on the remaining two elements, and established a

*prima facie* case of discrimination, AGP has articulated a legitimate, nondiscriminatory reason

for compensating Ms. Geist differently from male employees; specifically, her part-time status.

The primary distinction between Ms. Geist and the other employees at AGP was

employment structure.  Apart from Ms. Geist, everyone who worked at AGP while she was an

employee there was either a full-time employee with a set forty-hour per week schedule with two

days off or an independent contractor with no fixed hours.  Only Ms. Geist had a part-time

flexible fifteen-hour per week schedule – one for which she negotiated after having been offered

full-time and independent contractor positions.  Even though Ms. Geist frequently worked thirty

and forty-hour workweeks as a result of teaching lessons, this does not alter the fact that, unlike

AGP's full-time employees, she was only required to report to work fifteen hours a week.

Accordingly, she received a different compensation package from other employees that did not

include health benefits, educational opportunities or vacation days.[6]

In light of this evidence, Ms. Geist cannot meet her burden of establishing that the

defendant's proffered reason was merely a pretext for unlawful discrimination.  Accordingly,

defendant AGP is entitled to summary judgment on Ms. Geist's gender discrimination claim.

2.    *Retaliation*

Ms. Geist also alleges that she was retaliated against because she told Mr. Kardash that

she intended to file a charge of discrimination with the EEOC during a meeting on December 22,

2006.  On Ms. Geist's next work day, December 29, 2006, Mr. Kardash restructured her

---

[6] Ms. Geist's exclusion from the December 2006 Christmas golf outing, while not necessarily
attributable to her part-time status, does not constitute an adverse employment action for the
purpose of a Title VII discrimination claim.  An adverse employment action is a "discriminatory
act which adversely affects the terms, conditions, or benefits of the plaintiff's employment."
*James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal quotation
marks and citations omitted).  Although conduct "short of ultimate employment decisions can
constitute adverse employment action", there still must be a "tangible effect on the terms and
conditions of employment."  *Id*. at 371, 377 (internal citations omitted).  For instance, in *James*,
the Fourth Circuit found that speculations about the effect of a reassignment on future
opportunities for professional development were merely "stark assertions that [were] not
sufficient to survive summary judgment."  *Id*. at 377 (internal citation omitted).  While Ms. Geist
was the only golf professional at AGP excluded from the golf outing, she has not pointed to any
tangible effect on the terms or conditions of her employment other than to state that she was
deprived of an opportunity to network with customers and build relationships with her
colleagues.  One isolated incident of such "exclusion" does not constitute an adverse
employment action under Title VII.

employment arrangement so that she no longer had marketing responsibilities or a salary, but instead would be paid solely in commissions for teaching golf lessons.  Ms. Geist alleges this was retaliation in violation of Title VII.

To establish a *prima facie* case of retaliation, a plaintiff must show that she: (1) engaged in a protected activity; (2) the employer acted adversely against her; and (3) the protected activity and the adverse action were causally connected.  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).  If a plaintiff shows that he or she "complain[ed] to his or her employer or participate[d] in an employer's informal grievance procedure in an orderly and nondisruptive manner" in connection with an employer's alleged discrimination, then the employee's activities are entitled to protection.  *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 551 (4th Cir. 1999).  A plaintiff can demonstrate that an employer "acted adversely" by showing that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations and citation omitted); *see Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008).  The anti-retaliation provision of Title VII does not protect against "petty slights, minor annoyances, and simple lack of good manners" that will normally not deter employees from complaining to the EEOC.  *Burlington*, 548 U.S. at 68.

Ms. Geist engaged in protected activity when she told Mr. Kardash during a meeting on December 22, 2006 that she planned to file an EEOC complaint.  Contrary to what AGP argues, the fact that Ms. Geist did not actually file an EEOC charge until two or three months later is not dispositive, as a simple complaint to an employer may constitute protected activity.  *See Kubicko*, 181 F.3d at 551.  Furthermore, the elimination of Ms. Geist's salaried position was an

adverse employment action because it left her without the steady, guaranteed income that she had previously enjoyed at AGP, and would likely have dissuaded a reasonable employee from making or supporting a charge of discrimination.  Ms. Geist's claimed causal link between her protected activity and her adverse employment action is essentially that the former immediately preceded the latter and that the defendant has provided inconsistent explanations for the adverse action.  The close temporal proximity between Ms. Geist's complaint to Mr. Kardash (December 22nd) and her change in employment status (December 29th) alone is enough to show a *prima facie* case of retaliation under Title VII.  *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (noting with approval the conclusion of other courts that "the discharge of an employee soon after the employee engages in protected activity is strongly suggestive of retaliatory motive and thus indirect proof of causation".)

AGP argues, however, that Mr. Kardash had planned to restructure Ms. Geist's position in advance of the December 22, 2006 meeting in an effort to give her more flexibility and because she was unhappy doing counter work and had difficulty performing those duties. (Kardash Aff. at ¶¶ 9-10.)  Mr. Kardash also testified that the decision to eliminate her salary was "not a financial decision."  (Kardash Dep. at 111: 3-4.)  Ms. Geist, however, states that she initiated the December 22nd meeting when she asked Mr. Kardash to sign her LPGA employment verification form, and that after signing it he asked her to sit down and inquired whether "there was anything about which she was upset".  (Pl.'s Answer to Defs.' Interrog. # 13 at ¶ 23.)  It was then, Ms. Geist submits, that she told him she planned to file an EEOC complaint.  (*Id.*)  But according to Mr. Kardash, when he began to tell Ms. Geist of the possibility of an employment change on December 22nd, her reaction was to "yell out that she

was filing an EEOC complaint", and because she became upset, he stopped the meeting and

"indicated [they] would talk again after the [Christmas] holiday."  (Kardash Aff. at ¶ 10.)

Mr. Kardash states that he discussed the issue of Ms. Geist's employment arrangement

with his partner Ken Gill, as well as with Mr. Jefferson, Mr. Miller and Mr. Greek before the

December 22nd meeting, (*id*. at ¶ 9), but none of them confirm this.  Mr. Gill does not recall ever

having discussed the matter with Mr. Kardash.  (Gill Dep. at 29: 16-19, Jan. 21, 2009.)  Nor is

there any evidence that Mr. Jefferson or Mr. Greek knew about possible changes to Ms. Geist's

position before December 22nd.  (*See* Jefferson Dep.; Greek Dep.)  Mr. Miller testified that prior

to December 22nd he was aware that Mr. Kardash planned to discuss with Ms. Geist "how they

were going to move forward in whatever situation they were in."  (Miller Dep. at 100: 10-12,

Oct. 17, 2008.)  But when specifically asked whether Mr. Kardash had told him of a plan to put

Ms. Geist on one hundred percent commission, Mr. Miller responded, "I don't think he did.  I

think [Mr. Kardash and Ms. Geist] discussed that and discussed their options and how they were

going to move forward."  (*Id*. at 99: 7-13.)  And when asked a second time, "Did Mr. Kardash

tell you [before Ms. Geist said that she was filing an EEOC complaint] he was going to be

putting her on 100 percent commission?" Mr. Miller replied, "No."  (*Id*. at 100: 3-6.)

Drawing all reasonable inferences in favor of the nonmoving party, there remain

material questions of fact about the defendant's alleged legitimate nondiscriminatory reason for

eliminating Ms. Geist's salary altogether on December 29, 2006.  Mr. Kardash has

acknowledged that he did not restructure Ms. Geist's position for financial reasons, and there is

conflicting evidence regarding whether this decision was made *before* Ms. Geist expressed her

intention to file an EEOC charge.  Although Mr. Kardash testified that Ms. Geist struggled with

the responsibilities of counter duty, counter duty was only a portion of her salaried work.  Thus,

making all reasonable inferences in favor of Ms. Geist, the court finds that there is a triable issue

of material fact as to Ms. Geist's retaliation claim.  Defendant AGP, therefore, is not entitled to

summary judgment on this claim.

3.      *Hostile Work Environment*

Ms. Geist further alleges that she was subjected to inappropriate and misogynistic

comments and excluded from a company golf outing in violation of Title VII.

"When a workplace is permeated with discriminatory intimidation, ridicule, and insult . .

. that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment . . . Title VII is violated."  *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  By contrast, the "mere

utterance of an . . . epithet which engenders offensive feelings in a employee" does not implicate

Title VII.  *Id.* (internal quotation marks and citation omitted).  To state a *prima facie* case of

hostile work environment, a plaintiff must show that: "(1) the harassment was unwelcome; (2)

the harassment was based on [her gender]; (3) the harassment was sufficiently severe or

pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there

is some basis for imposing liability on the employer."  *Causey v. Balog*, 162 F. 3d 795, 801 (4th

Cir. 1998).  In order to survive summary judgment, there must be a triable issue of material fact

with regard to each element of a hostile work environment claim.  Here, even assuming there is a

triable issue of fact with regard to the first three elements, there is nevertheless no basis for

imposing liability on AGP.

Employers are liable for harassment by a victim's coworkers only if they "knew or

should have known about the harassment and failed to take effective action to stop it."  *Equal

Employment Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008)

14

(internal quotation marks and citation omitted.)  Knowledge may be imputed if "a reasonable

person, intent on complying with Title VII, would have known about the harassment."  *Id.*

(internal quotation marks and citation omitted.)  The Fourth Circuit has held that evidence of

"repeated complaints to supervisors and managers creates a triable issue as to whether the

employer had notice of the harassment."  *Id.* at 320; *see also Equal Employment Opportunity*

*Comm'n v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 177 (4th Cir. 2009) (finding that where the

victim complained to both her supervisor and the company's president about her co-workers'

harassment "on a number of occasions", the employer knew about the harassment).  If the

employer had notice, then it will be liable to the victim unless it responded to the harassment

with "action reasonably calculated to end [it]."  *Sunbelt*, 521 F.3d at 319 (internal quotation

marks and citation omitted.)

Mr. Greek was responsible for the worst of the comments made to Ms. Geist or in her

presence, but Ms. Geist testified that she did not complain to Mr. Kardash or to anyone else in a

managerial position about them.[7]  (*See* Geist Dep. at 240-51.)  Thus, other than the instance

when Mr. Greek shouted, "Which one of you goddamn women complained about [the cigar

smoke]?" in his presence, Mr. Kardash had no knowledge of Mr. Greek's repeated inappropriate

remarks, nor does Ms. Geist allege that he should have known about them for some other reason.

Unlike in *Sunbelt* and *Central Wholesalers*, where numerous complaints to supervisors about co-

worker harassment led the Fourth Circuit to conclude that the employer had notice of the

harassment, here, Ms. Geist testified that she did not tell anyone in a position of authority about

Mr. Greek's behavior.  Even construing the facts in the light most favorable to Ms. Geist, the

---

[7] In her affidavit Ms. Geist states generally that she "repeatedly complained to Defendant
Kardash about instances of lewd, sexual comments", but when specifically asked in her
deposition about each individual alleged lewd comment she answered that she had not told Mr.
Kardash.  (*See* Geist Aff. at ¶ 19; Geist Dep. at 240-51.)

court finds that a single inappropriate comment made in front of Mr. Kardash is not sufficient to put him on notice of sexual harassment. For this reason, there is no triable issue of fact as to whether sexual harassment by Mr. Greek is imputable to AGP.

The remaining harassment of which Ms. Geist complains – specifically Mr. Kardash's inappropriate questions and her exclusion from the December 2006 golf outing – is not, by itself, severe or pervasive enough to make out a *prima facie* case of hostile work environment.[8] Whether harassment is "severe or pervasive" is an objective and subjective inquiry. *Sunbelt*, 521 F.3d at 315. Ms. Geist has alleged that she subjectively perceived the environment at AGP to be abusive, but she also must demonstrate that the conduct at issue was such that "'a reasonable person in [her] position' would have found the environment hostile or abusive." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-02 (1998)). The objective inquiry focuses on the totality of the circumstances and considers such factors as the "'frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Sunbelt*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 22).

But Title VII does not establish a "general civility code for the American workplace", *Oncale*, 523 U.S. at 80, and "not all sexual harassment that is directed at an individual because of his or her sex is actionable." *Hartsell*, 123 F.3d at 772. Rather, actionable conduct must be "so extreme as to amount to a change in the terms and conditions of employment." *Sunbelt*, 521 F. 3d at 315 (internal quotation marks and citation omitted). Thus, "'simple teasing, offhand

---

[8] Ms. Geist's allegations regarding Mr. Jefferson do not include any gender-focused harassment. Rather, she alleges that he lost his temper at her on at least one occasion. Accordingly, because Mr. Jefferson's comments were not based on Ms. Geist's gender, they do not form the basis for a *prima facie* case of hostile work environment. *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) (stating that "[w]e have made clear that only harassment that occurs because of the victim's gender is actionable") (internal citation omitted).

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  In *Sunbelt*, the Fourth Circuit found that there was a triable issue as to whether habitual harassment of a Muslim employee, which included calling him derogatory names such as "Taliban" and "towel head", mocking his appearance and his attendance at prayer sessions, and hiding his timecard and defacing his business card with terms such as "dumb ass" when he went to prayer, was severe and pervasive, but it also observed that any of the alleged incidents of harassment, "viewed in isolation, would not have been enough to have transformed the workplace into a hostile or abusive one." 521 F.3d at 316, 317, 318.  The court stated that, "[n]o employer can lightly be held liable for single or scattered incidents." *Id.* at 318.  But it found that the "constant and repetitive abuse" experienced by the employee in that case was more than merely offensive. *Id.*

Here, the totality of the circumstances suggest that Mr. Kardash's comments to Ms. Geist, while offensive and unwelcome, were not severe or pervasive enough to change the terms or conditions of her employment.  Unlike those at issue in *Sunbelt*, the comments here were scattered, isolated incidents rather than constant and repetitive harassment.  Moreover, Ms. Geist testified that when Mr. Kardash asked her three times whether she had a boyfriend it was always in "his typical joking demeanor." (Geist Dep. at 194: 13-14.)  She also testified that when Mr. Kardash asked whether she would marry him it was in the context of running late to get home because he had stayed too long at work.  (*Id.* at 195: 2-17.)  The implication is that his wife would divorce him for being late.  Additionally, Ms. Geist affirmed in her deposition that she understood Mr. Kardash to have been joking when he asked her to accompany him to watch Michelle Wie play golf.  (*Id.* at 203: 11-16.)  Although whether Mr. Kardash was joking is not

dispositive, the record suggests that Mr. Kardash's comments, while inappropriate, are more accurately described as "mere offensive utterances" than "severe or pervasive" harassment.

Furthermore, even coupled with Ms. Geist's exclusion from the December 2006 golf outing, Mr. Kardash's comments still do not give rise to a cognizable hostile work environment claim. Twelve men, including all the male golf professionals at AGP, attended the AGP Christmas golf outing on Friday, December 15, 2006, but Ms. Geist was not invited. (*See* Pl.'s Summ. J. Mem. Ex. 23.) AGP argues that the outing was simply an informal gathering of friends, and that someone had to remain in the golf shop and Ms. Geist was scheduled for facility time that day. (Kardash Dep. at 184-86.) Ms. Geist does not deny that she was scheduled to work that day. (Geist Dep. at 222: 14-19.) Even drawing all inferences in Ms. Geist's favor, this one-time exclusion, added to Mr. Kardash's comments, does not amount to severe and pervasive discrimination in the workplace. Therefore, the court will grant defendant AGP's motion for summary judgment on Ms. Geist's hostile work environment claim.

B.    *Equal Pay Act*

Ms. Geist also alleges that she was paid less than Mr. Miller, her male counterpart at AGP, in violation of the Equal Pay Act. Mr. Miller is also a PGA Class A teaching professional and began working at AGP at approximately the same time as Ms. Geist. The crux of Ms. Geist's claim is that AGP paid Mr. Miller a salary of $25,000 for forty hours of work per week during which he could also teach lessons for seventy-five percent commission, whereas AGP paid her $15,000 for fifteen hours of work per week and seventy percent commission for lessons that had to be taught *in addition* to rather than *during* her salaried hours. Mr. Miller also received a Christmas bonus and health care benefits, but Ms. Geist received neither.

To make out a *prima facie* case under the EPA, a plaintiff must show that: (1) the "employer pays different wages to employees of opposite sexes"; (2) for "equal work on jobs the performance of which requires equal skill, effort, and responsibility"; and (3) "which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (internal citation omitted). "In interpreting the EPA, equal means *substantially equal*." *Wheatley v. Wicomico Ct.*, 390 F.3d 328, 332 (4th Cir. 2004) (internal quotation marks omitted and emphasis in original). Courts look to whether the jobs require substantially equal skills and responsibilities. *See id.* at 333. "The crucial finding on the equal work issue is whether the jobs to be compared have a common core of tasks, i.e., whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different." *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir. 1986) (internal quotation marks and citations omitted).

Ms. Geist is unable to establish a *prima facie* case under the EPA because she has not shown that she and Mr. Miller performed substantially equal jobs under similar working conditions. Although Ms. Geist and Mr. Miller are both Class A teaching professionals, aside from teaching golf lessons their duties at AGP were quite different. Mr. Miller is an assistant manager with a set forty-hour workweek that includes such duties as opening and closing the facility, handling inventory, and supervising other employees. AGP hired Ms. Geist, on the other hand, to handle the company's marketing and to perform counter duty, which involves primarily the sale of golf equipment. Unlike Mr. Miller, she was not in charge of opening or closing the facility, nor did she supervise other employees. Further unlike Mr. Miller, her schedule was flexible, as she only had to work fifteen hours per week and could complete some of those hours from home.

As a result of their different responsibilities and employment arrangements, Ms. Geist and Mr. Miller had different compensation structures.  For instance, while Ms. Geist earned more per hour than Mr. Miller, she initially earned less in commission than he did.[9]  But such differences, even assuming they are unequal, are not actionable under the EPA because Ms. Geist and Mr. Miller did not have substantially equal duties and responsibilities at AGP. Accordingly, the defendants' motion for summary judgment on Ms. Geist's EPA claim will be granted.

*C.     ERISA*

Ms. Geist's final claim is that the defendants violated ERISA, 29 U.S.C. § 1024(b)(4), because they failed to provide her with documents pertaining to AGP's health insurance plan within thirty days of her written request.  She therefore asserts that she is entitled to damages under 29 U.S.C. § 1132(c)(1).

Pursuant to § 1024(b)(4), administrators of employee benefit plans covered by ERISA must provide certain information to plan participants.  § 1024(b)(4) states in full that:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

If an administrator does not comply with a participant's request "for any information which such administrator is required . . . to furnish to a participant by mailing the material requested . . . within thirty days", then the administrator "may in the court's discretion be personally liable to

---

[9] AGP increased Ms. Geist's commission rates to those of Mr. Miller's after she had been employed there for several months.

such participant . . . in the amount of up to $100 a day from the date of such failure or refusal."   §

1132(c)(1).

The defendants argue that ERISA does not apply to the present matter because Ms. Geist

does not qualify as a "participant" for the purposes of § 1024(b)(4).  The court agrees.

A "participant" as used in § 1024(b)(4) is defined by statute as:

> any employee or former employee of an employer, or any member or former member of
> an employee organization, who is or may become eligible to receive a benefit of any type
> from an employee benefit plan which covers employees of such employer or members of
> such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7).  Even if an employee is not currently covered by a plan but someday will

be, then she may nevertheless qualify as a participant because the definition includes those who

"may become eligible."  *See Fleming v. Ayers & Associates*, 948 F.2d 993, 998 (6th Cir. 1991)

(finding that a part-time employee who was "hired with the intent that she move into a full-time

position when a job became available" was a participant under § 1002(7) because it was

undisputed that she "would have become eligible . . . for health insurance benefit upon moving to

a full-time nursing job.")

Although Ms. Geist argues otherwise, the record suggests that she was not eligible for

health benefits under AGP's plan.  The plan states that an eligible employee must "[w]ork on a

full-time basis and have a normal workweek of 30 or more hours."  While Ms. Geist alleges that

she often worked more than thirty hours a week, she was not a "full-time" employee with a

"normal workweek" because she was only required to work fifteen hours per week.  Unlike other

full-time employees who were required to work forty hours per week with two set days off, Ms.

Geist had the flexibility to schedule her fifteen salaried hours throughout the week and to

supplement them with golf lessons.  Ms. Geist's flexible schedule unfortunately excluded her

from AGP's health insurance plan.

Moreover, there is no evidence that Ms. Geist might become eligible under the plan. Unlike in *Fleming*, where an employer hired a part-time employee with the intent that she would become full-time when a position opened up, here, Ms. Geist rejected a forty hour per week full-time schedule on more than one occasion and seems to have understood that this decision disqualified her for benefits.  In a letter to Mr. Kardash dated November 16, 2006, Ms. Geist wrote:

> My needs and priorities are the same as they were during the interview process last December.  As you may recall, flexibility is very important to me . . . So, I cannot entertain a rigid 5 day work schedule with set days off as you proposed. . . While I am a little disappointed that my receiving full-time benefits depends upon forfeiting my flexibility and working on Sunday mornings, I understand and respect your desire for consistency.

(Defs.' Summ. J. Mem. Ex. 10.)  Because Ms. Geist was neither eligible, nor was to become eligible, under the AGP health insurance plan, she was not a "participant" for purposes of ERISA.  Therefore, the defendants are entitled to summary judgment on Ms. Geist's ERISA claim.

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment will be granted in part and denied in part.  A separate Order follows.


___November 24, 2009___                          _____/s/_____
Date                                             Catherine C. Blake
                                                 United States District Judge